1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


UNITED STATES OF AMERICA,      :
                               :
            Plaintiff,         :     No. 18-cr-00171-001
                               :
vs.                            :     TRANSCRIPT OF
                               :
VINCENT MITCHELL BALLARD,      :     PROCEEDINGS
                               :
            Defendant.         :
--------------------------:


The above-entitled matter came on for

Hearing before the Honorable James E. Gritzner at the

Second Floor Courtroom of the United States Federal

Courthouse, 123 East Walnut Street, Des Moines, Iowa,

commencing at 11:00 a.m. on October 25, 2018.


BEFORE THE HONORABLE JAMES E. GRITZNER

UNITED STATES FEDERAL COURT


Reported by:  SueAnn Jones, CSR, RPR

2

```
 1                    A P P E A R A N C E S

 2

 3   Plaintiff by:       RYAN LEEMKUIL

 4                         - and -

 5                       MIKAELA SHOTWELL

 6                       Assistant United States Attorneys

 7                       110 East Court Avenue

 8                       Room 286

 9                       Des Moines, Iowa 50309

10

11   Defendant by:       F. MONTGOMERY BROWN

12                       Attorney at Law

13                       1001 Office Park Road

14                       Suite 108

15                       West Des Moines, Iowa 50265

16

17   Also present:       Hannah Shirey, Law Clerk

18

19

20

21

22

23

24

25
```

3

```
1                    I N D E X

2

3    WITNESSES              DIRECT          CROSS

4    Brian Minnehan         5, 21              15

5

6

7    EXHIBIT                PAGE(S) REFERRED TO

8       4                   11, 12

9       5                   12, 13, 18, 20, 28

10      A                   16, 22

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                    P R O C E E D I N G S

2              THE COURT:  Good morning.  We are convened

3    in the matter of the United States vs. Vincent Mitchell

4    Ballard, Criminal No. 18-171, the Defendant's Motion to

5    Suppress.

6              I have read your materials and look forward

7    to learning some more from you this morning.

8              The Government, of course, has the burden of

9    demonstrating that the search and related activity is

10   supported, so is the Government ready to present

11   evidence in support?

12             MR. LEEMKUIL:  Yes, Your Honor.

13             THE COURT:  All right.  Do either party wish

14   to make any statement to the Court before we hear

15   evidence?

16             MR. LEEMKUIL:  No, Your Honor.

17             MR. BROWN:  Your Honor, based upon the

18   Clayton case the Government cited, we withdraw our

19   objection to the initial entry.

20             We still maintain objection to searching

21   under the bed, et cetera, et cetera, and I have some

22   complaints about the legitimacy of the warrant.

23             THE COURT:  Okay.  You have gone ahead of

24   one of my questions there.  I wondered about whether the

25   Clayton case made a difference to you, so okay.  Thank

5

1    you for that clarification.

2              And go ahead and call your first witness.

3              MR. LEEMKUIL:  The Government would call

4    Officer Brian Minnehan.

5              THE COURT:  Officer, if you'll step up here,

6    she'll place you under oath.

7                         BRIAN MINNEHAN,

8    duly sworn as a witness, testified as follows:

9              THE COURT:  Take a seat over here, please.

10                    DIRECT EXAMINATION

11   BY MR. LEEMKUIL:

12      Q.  Could you state your name for the record, sir.

13      A.  Brian Minnehan.

14      Q.  How are you employed?

15      A.  I'm a police officer for the Des Moines Police

16   Department.

17      Q.  How long have you been employed with the

18   Des Moines Police Department?

19      A.  Approximately three and a half years.

20      Q.  What is your current assignment?

21      A.  I'm currently assigned to first watch patrol.

22      Q.  Could you tell me a little bit about the training

23   that you underwent to become a Des Moines police

24   officer?

25      A.  I have a bachelor's degree in criminal justice

6

1    from Buena Vista University, and I attended a six-month

2    Des Moines Regional Training Academy.

3        Q.   Were you recently assigned to the Des Moines

4    Police Department's special enforcement team?

5        A.   Yes, I was.

6        Q.   And is that sometimes called the SET team?

7        A.   Yes, the Summer Enforcement Team.

8        Q.   What time periods were you assigned to the SET

9    team most recently?

10       A.   From April of this year to October of this year.

11       Q.   What does the SET team do?

12       A.   It's a proactive unit.  We don't respond to calls

13   for service.  Instead we focus on gangs, guns,

14   narcotics, and wanted people.

15       Q.   In the course of being on the SET team and your

16   general experience as a police officer, have you

17   participated in the execution of arrest warrants?

18       A.   Yes, I have.

19       Q.   Have you participated in searching for

20   individuals that are wanted by police?

21       A.   Yes, I have.

22       Q.   Have you searched for wanted individuals inside

23   of homes?

24       A.   Yes.

25       Q.   In your experience, do people that are wanted by

1   police attempt to hide from the police?

2      A.  Oftentimes they do.

3      Q.  What kinds of places have you found individuals

4   hiding from police?

5      A.  In many different places, in laundry machines,

6   underneath kitchen sinks and cabinets, underneath beds.

7      Q.  Roughly how many times in your experience as a

8   police officer have you found individuals hiding under

9   beds?

10      A.  Multiple times.

11      Q.  Have you also become aware of other officers who

12   have found individuals hiding under beds?

13      A.  Yes.

14      Q.  In your experience as a police officer, is under

15   the bed a common place to hide from police?

16      A.  Yes, it is.

17      Q.  Were you on duty on July 24 of this year?

18      A.  Yes.

19      Q.  Were you assigned to the SET team at that time?

20      A.  Yes, I was.

21      Q.  Were you in uniform and driving a marked car?

22      A.  Yes.

23      Q.  Were you also wearing a body camera on July 24?

24      A.  Yes, I was.

25      Q.  Were Des Moines police officers conducting

8

1    surveillance on July 24?

2      A.  Yes, we were.

3      Q.  And where was that at?

4      A.  2005 27th Street.

5      Q.  Who was believed to reside at that address?

6      A.  Vincent Ballard.

7      Q.  Why were officers conducting surveillance of

8    Mr. Ballard's residence?

9      A.  He was known to be wanted as well as having

10   several active charges out of our agency.

11     Q.  Was he also suspected of being involved in

12   possible drug trafficking?

13             MR. BROWN:  Objection.  No foundation.

14             THE COURT:  Overruled.

15     A.  We had information from narcotics officers that

16   he may be involved in methamphetamine sales.

17     Q.  Did you become aware on July 24 that the

18   Defendant was present at his home?

19     A.  Yes, I was.

20     Q.  How did you learn that?

21     A.  We had an unmarked vehicle with a plainclothes

22   officer inside it conducting surveillance.  He had

23   radioed that he had observed Mr. Ballard on the front

24   step of his address.

25     Q.  Were other individuals also observed on the front

1    steps of that residence?

2       A.  Yes.

3       Q.  At that point did you approach that home at

4    2005 27th Street?

5       A.  Yes, we did.

6       Q.  Did you see the Defendant as you approached the

7    home?

8       A.  Yes, I did.

9       Q.  Did the Defendant see you?

10      A.  Yes, he did.

11      Q.  What did the Defendant do at that time?

12      A.  As soon as he saw our marked police vehicle

13   pulling up, he turned around and ran into the house.

14      Q.  Did officers pursue the Defendant into the home?

15      A.  Yes, we did.

16      Q.  Did you also enter the home?

17      A.  Yes, I did.

18      Q.  Had you ever been in this home?

19      A.  No.

20      Q.  Were you familiar with the layout of the home

21   inside?

22      A.  No.

23      Q.  Did you have any knowledge of any potential

24   hiding spots inside the home?

25      A.  No, I did not.

10

1    Q.   Did you know if anyone else was inside the home

2  at the time you entered other than the Defendant?

3    A.   No.

4    Q.   Once you were inside the home, did you

5  participate in the search for the Defendant?

6    A.   Yes.

7    Q.   In doing so, did officers observed suspected

8  contraband on the main floor of the home?

9    A.   Yes.   Sergeant Robinson observed what appeared to

10  be drug paraphernalia in the home.

11   Q.   Were officers able to locate the Defendant on the

12  main floor?

13   A.   No, we were not.

14   Q.   At that point did you move to the basement of the

15  home to continue the search?

16   A.   Yes.

17   Q.   Could you just generally describe the layout of

18  the basement?

19   A.   You come down the stairs.   On the east side of

20  the home, they come into a furnace room.   There's a

21  laundry room on the south side of the basement.   The

22  southwest corner room is a bar area, and the northwest

23  corner is a bedroom.

24   Q.   And did you eventually enter the bedroom in the

25  basement?

11

1    A.  Yes, I did.

2    Q.  And did you look under the bed that was in that

3  bedroom?

4    A.  Yes.

5    Q.  Did you move the bed at all in doing so?

6    A.  No, I did not.

7    Q.  What did you observe when you looked under the

8  bed?

9    A.  Two clear plastic baggies that contained a

10  crystalline substance consistent with methamphetamine.

11    Q.  At that time did you touch or seize the items you

12  saw under the bed?

13    A.  No, I did not.

14    Q.  What did you do next?

15    A.  Continued searching for Mr. Ballard.

16    Q.  Where did you ultimately find the Defendant?

17    A.  In the shelf of a bar that was connected -- in a

18  room connected to the bedroom.

19    Q.  And did you place Mr. Ballard under arrest at

20  that time?

21    A.  Yes, I did.

22    Q.  Officer Minnehan, I want to show you what has

23  been marked as Exhibit 4.  Do you recognize that?

24    A.  Yes, I do.

25    Q.  What is on that disk?

1    A.   It's a short clip of this incident from my body

2    one camera.

3    Q.   And how do you know that this is the video you

4    previously reviewed?

5    A.   Because I had previously initialed the disk.

6         MR. LEEMKUIL:   The Government would offer

7    Exhibit 4, Your Honor.

8         MR. BROWN:   No objection.

9         THE COURT:   Four is admitted.

10   Q.   Officer Minnehan, does that video show the

11   basement bedroom and the bed that you looked under while

12   searching for Mr. Ballard on July 24?

13   A.   Yes.

14   Q.   Does it also show an ottoman or a footstool at

15   the end of the bed kind of shoved up against the bed?

16   A.   Yes.

17   Q.   Did you look under that ottoman that's at the end

18   of the bed?

19   A.   No, I did not.

20   Q.   Officer Minnehan, I'm going to show you what's

21   been marked as Government Exhibit 5.  Does that photo

22   fairly and accurately depict the bed -- the space under

23   the bed that you looked under on July 24?

24   A.   Yes.

25        MR. LEEMKUIL:   Your Honor, we would offer

13

1    Exhibit 5.

2              MR. BROWN:  No objection.

3              THE COURT:  Five is admitted.

4    Q.  Officer Minnehan, was the bed that you looked

5    under on July 24, was it on a bed frame?

6    A.  Yes, it was.

7    Q.  And by nature of being on that frame, was the box

8    spring and mattress elevated off the floor?

9    A.  Yes.

10   Q.  So there was space then created between the

11   bottom of the bed and the floor?

12   A.  That's correct.

13   Q.  Why did you look under the bed?

14   A.  In an attempt to locate Mr. Ballard.  I thought

15   he may be hiding under there.

16   Q.  Based on your training and experience at the time

17   you looked under that bed, did you believe that it was a

18   place somebody could be hiding?

19   A.  Yes.

20   Q.  Based on items that were observed in the home,

21   did the Des Moines Police Department obtain a search

22   warrant to search Mr. Ballard's home?

23   A.  Yes, we did.

24   Q.  And was the home then searched that day pursuant

25   to that warrant?

1      A.   Yes.

2      Q.   Did you participate in that search?

3      A.   Yes, I did.

4      Q.   What kinds of items were seized from the

5   property?

6      A.   The methamphetamine that was located under the

7   bed.  There was a stolen vehicle in the garage, drug

8   paraphernalia, packaging and scales consistent with

9   methamphetamine sales as well as items from vehicles

10   belonging to other people, two firearms, LSD tablets,

11   more methamphetamine.

12             MR. LEEMKUIL:  Those are my questions, Your

13   Honor.  We also filed Government Exhibits 1 through 3

14   which were the search warrant, the arrest warrant, and

15   the evidence receipt for the items seized during the

16   search.  We'd offer those as well at this time.

17             MR. BROWN:  No objection.

18             THE COURT:  Exhibits 1 through 3 are

19   admitted.

20             MR. LEEMKUIL:  Those are my only questions.

21   Thank you.

22             THE COURT:  Mr. Brown.

23             MR. BROWN:  Thank you, Judge.

24

25

1                          CROSS-EXAMINATION

2   BY MR. BROWN:

3       Q.  Good morning, Officer.

4       A.  Good morning.

5       Q.  It's a pleasure to meet a fellow Buena Vista

6   University graduate.  The objective for entering the

7   home was to find a person.  Is that not correct?

8       A.  That is correct.

9       Q.  You weren't looking for drugs?

10      A.  Correct.

11      Q.  You weren't looking for guns?

12      A.  Correct.

13      Q.  You weren't looking for stolen property?

14      A.  That's correct.

15      Q.  You were looking for Mr. Ballard?

16      A.  Right.

17      Q.  Who's a grown adult male; is that right?

18      A.  Yes, he is.

19      Q.  And he's a relatively large male.  Is that a fair

20  statement or average height and weight; is that right?

21      A.  I would say average, yes.

22      Q.  Now, is it your claim that this bedroom that you

23  looked under the bed is in the same room as the bar?

24      A.  No, it's not.

25      Q.  So it's a separate room, is it not?

16

1    A.  It is.

2    Q.  But it's in the basement?

3    A.  Correct.

4    Q.  And you claim that you seized the methamphetamine

5    under the bed after the warrant was obtained; is that

6    correct?

7    A.  I did not personally seize it.  Another officer

8    seized it, but yes, after the warrant was obtained.

9    Q.  It was actually Officer Scarlett, was it not?

10   A.  I couldn't tell you for sure.

11   Q.  Well, the Exhibit 3 indicates certain things that

12   you found, including Item 20, 25, 26 -- excuse me -- 25,

13   27, 28.

14        Those seem to be all things that were

15   outside or in a vehicle.  Does that refresh your

16   recollection?

17   A.  The things that I personally seized were -- yeah,

18   that sounds right.

19   Q.  So you didn't log in anything from the house

20   specifically as you having found it; is that correct?

21   A.  Not that I recall, no.

22   Q.  I am going to show you what I have had premarked

23   as Defendant's Exhibit A for identification.  Can you

24   tell me what Exhibit A for identification is, please?

25   A.  It's a photo of the bedroom where I located the

1   methamphetamine.

2       Q.  All right.  This is the room we're talking about;

3   is that right?

4       A.  Yes.

5       Q.  And you were looking in from the door; is that

6   correct?

7       A.  Correct.

8               MR. BROWN:  Offer A, Your Honor.

9               MR. LEEMKUIL:  No objection.

10              THE COURT:  A is admitted.

11              MR. BROWN:  Give the Court a copy here.

12              THE COURT:  Thank you.

13              MR. BROWN:  You're welcome.

14      Q.  So looking in through the door, you see a --

15   looks like a blue stool of some kind; is that right?

16      A.  Yes.

17      Q.  Then there's a gray stool over by the cabinet

18   along the wall?

19      A.  Correct.

20      Q.  And then we have a footstool or leg stool in

21   front of the bed; is that right?

22      A.  Yes.

23      Q.  And then the bed is behind it; is that correct?

24      A.  That's correct.

25      Q.  All right.  As a fellow Buena Vista graduate and

1   academy completer -- completion, do you claim that any

2   adult human being, including Mr. Ballard, could get

3   under that bed?

4       A.   I would say yes.

5       Q.   What's that?

6       A.   I believe so, yes.

7       Q.   All right.  Do you have the photograph in front

8   of you?

9       A.   Yes, I do.

10      Q.   Of underneath the bed?

11      A.   Yes, I do.

12      Q.   All right.  So looking at Exhibit 5, the objects

13  in Exhibit 5 are part of a fishing pole; is that right?

14      A.   It would appear so.

15      Q.   Some kind of hand crank; is that correct?

16      A.   Correct.

17      Q.   And then there's a spinning fishing reel between

18  the two baggies; is that correct?

19      A.   Correct.

20      Q.   All right.  And that spinning fishing reel

21  basically goes to the top of -- or the underside of the

22  bed; is that right?

23      A.   No.  I would disagree with that.

24      Q.   So how many inches do you claim was -- existed

25  between the bed bottom and the floor?

1    A.  I would say approximately between 8 and

2    10 inches.

3    Q.  Eight to 10 inches?

4    A.  Yes, sir.

5    Q.  Is the distance from the bed to the floor the

6    same as the distance from the footstool to the ground?

7    A.  No.

8    Q.  And what's the difference that you claim exists

9    between those two objects?

10   A.  I would be guessing.  I didn't measure either

11   one.

12   Q.  Could the Defendant get underneath that blue

13   footstool under the bottom two rungs?

14   A.  Are you talking about the blue stool or the

15   footstool?

16   Q.  I am talking about the blue stool now.

17   A.  I would say the blue stool foot rungs are

18   somewhat close, maybe a little bit shorter than the

19   bottom of the bed.

20   Q.  So you're claiming that the two -- the bottom

21   ring on the blue stool and the front of Exhibit A is

22   higher or lower than the distance between the bed and

23   the floor?

24   A.  From the photograph, I can't be sure, and I don't

25   recall exactly from memory.

1    Q.  And so you think that if I laid the Defendant on

2    the floor in this courtroom and stuck that blue stool

3    over his chest that he would fit underneath there?

4    A.  I have no idea.

5            THE COURT:  Mr. Brown, may I see Exhibit 5,

6    please?

7            MR. BROWN:  Yes, Your Honor.

8            THE COURT:  I have seen the video, but I've

9    not seen Exhibit 5.  Are you done with that with the

10   witness?

11           MR. BROWN:  Yes, Your Honor.

12   Q.  Well, did you take any measurements of the

13   distance between the floor and the underside of the bed?

14   A.  No.

15   Q.  And whatever is on your body cam will accurately

16   reflect the distance between the bed bottom and the

17   floor.  Is that a fair statement?

18   A.  It may be somewhat distorted due to the angle.

19   If I'm looking down from above and not exactly level, it

20   may look narrower.

21   Q.  And once again --  Well, let me ask you this.

22   How big were those baggies of controlled substance?

23   A.  Couple inches in diameter, I would say.

24   Q.  About the size approximately of a golf ball?

25   A.  I would say slightly larger than that.

1    Q.  Baseball?

2    A.  In between a baseball and a golf ball.

3    Q.  Like an orange?

4    A.  Possibly, yes.

5    Q.  Tangerine?

6    A.  Possibly, yes.

7    Q.  How many tangerines could you put in there if you

8  stacked them on top between the floor and the bottom of

9  the bed?

10    A.  I have no idea.

11    Q.  So your testimony today is that you maintain that

12  when you went into that bedroom, you believed that a

13  human being, an adult human being, specifically

14  Mr. Ballard, could secret himself under that bed frame?

15    A.  Yes, I do.

16        MR. BROWN:  No further questions, Your

17  Honor.  Thank you.

18        THE COURT:  Redirect?

19        MR. LEEMKUIL:  Thank you, Your Honor.

20            REDIRECT EXAMINATION

21  BY MR. LEEMKUIL:

22    Q.  Officer Minnehan, when you're searching for

23  wanted individuals, is it your practice to take

24  measurements before looking in areas for them?

25    A.  No, it's not.

22

1    Q.  Where did you ultimately find the Defendant on

2  July 24?

3    A.  On the shelf of a bar.

4    Q.  You looked at Defendant's Exhibit A which was a

5  photo of the bedroom from the doorway; correct?

6    A.  Correct.

7    Q.  And you have also taken a look at the body cam

8  footage from your camera?

9    A.  Yes, I have.

10    Q.  Would you agree that that body cam includes

11  footage from when you entered the room and then looked

12  directly at the bed?

13    A.  Yes.

14    Q.  And does that footage reflect the space

15  accurately between the floor and the bottom of the bed?

16    A.  Yes.

17    Q.  I think you testified also that you did not look

18  under that ottoman in the room; is that right?

19    A.  That's correct.

20    Q.  Why not?

21    A.  I did not believe a person could hide under the

22  ottoman due to the space from the bottom of the ottoman

23  to the top of the floor.

24        MR. LEEMKUIL:  Those are all my questions.

25  Thank you.

1            MR. BROWN:  No further cross, Your Honor.

2            THE COURT:  All right.  You may step down,

3   Officer.

4            Mr. Leemkuil, any additional evidence?

5            MR. LEEMKUIL:  No, Your Honor.

6            THE COURT:  Mr. Brown, do you wish to offer

7   any evidence?

8            MR. BROWN:  No, Your Honor.

9            THE COURT:  All right.  And let me hear your

10   thoughts, Mr. Brown, on the motion.

11            MR. BROWN:  Thank you, Your Honor.

12            THE COURT:  And of course, I've read your

13   prior material.

14            MR. BROWN:  Although the initial entry into

15   the home was lawful, we respectfully submit that after

16   the Court reviews the video, examines the photographs,

17   compares that to the testimony of Officer Minnehan, the

18   Court would find that although the officers were

19   lawfully in the premises to search for Mr. Ballard, no

20   reasonable person would have cause to believe that

21   Mr. Ballard was hiding under that box spring and that

22   mattress and that the plain view doctrine does not

23   apply.

24            It was a warrantless search in a place --

25   place for -- a place that the Defendant could not secret

1    himself.

2                    Exhibit 1 is the search warrant application.

3    Search warrant application utilized what I claim is an

4    unreasonable search under the bed.  They specifically

5    reference the fact that the baggies were observed under

6    the bed.

7                    The Government has the burden of proving

8    that the good faith doctrine applies in this matter.

9    The Government has put on no evidence regarding the

10   warrant itself, and I make these following observations

11   to repudiate any good faith reliance on that.

12                   Mike Fong, Officer Fong, claims that

13   Mr. Ballard is currently employed at B&O Auto Sales at a

14   specific address, and they provide no information as to

15   the source of that claim.

16                   They claim that B&O Auto Sales is associated

17   with -- or he's associated with C&H Auto which is

18   associated with Mr. Karaidos -- that is

19   K-a-r-a-i-d-o-s -- who's currently in possession -- or

20   federal prison for methamphetamine trafficking.

21                   Mr. Fong claims that Mr. Ballard is reputed

22   to be involved in methamphetamine transactions, but the

23   warrant provides no basis of knowledge for that.  It

24   provides no information regarding the reliability of the

25   source, whether the benefits are provided to that source

1    for that information, who the source is, whether that

2    source is paid or the time frame for the basis of those

3    claims.

4              It goes on to claim that during the month of

5    July 2018, Task Force Detective Griffiths provided

6    information that Mr. Ballard was involved in trafficking

7    pound quantities of methamphetamine and that he may be

8    using vehicles and vehicle parts to conceal the

9    methamphetamine.

10             Once again, we don't know who the basis --

11   who the source of information is for Detective

12   Griffiths' claims.  We don't know the reliability of

13   those claims.  We don't know the reliability of that

14   person, their basis of knowledge, or when they provided

15   that information.

16             Then it is claimed that in July of 2018,

17   Officer Carter received information that Ballard was

18   suspected of theft of a red Ford truck, yet no evidence

19   is provided in the warrant that the truck was on the

20   premises.  And there's simply no probable cause to

21   believe the truck was on the premises, and once again,

22   we have no knowledge about the basis of knowledge of the

23   informant, when that informant obtained that

24   information, if that informant was receiving benefits,

25   whether that informant was involved in narcotics

1   trafficking himself.

2           And as I said, what Minnehan -- Officer

3   Minnehan discovered was proved that was utilized to

4   obtain ultimately the warrant in this matter.  So for

5   those reasons, Your Honor, I ask that the Court find

6   that the search under the bed was unreasonable, and it's

7   not safe under the good faith Leon exception to warrant

8   failures, Your Honor.  Thank you.

9           THE COURT:  Your argument this morning is

10  considerably broader than the original motion.  Would

11  that be a fair statement?

12          MR. BROWN:  It is, Your Honor.

13          THE COURT:  Okay.  And all right.  So I

14  wanted to make sure I hadn't missed something but -- and

15  I understand your argument essentially is -- well, let's

16  make it simpler.  If they're looking for Mr. Ballard and

17  they look in the medicine cabinet in the bathroom,

18  obviously, he couldn't be in there.

19          MR. BROWN:  Right.

20          THE COURT:  And so it becomes a more

21  subjective question as to whether or not he could have

22  been under the bed.  But basically, that's your

23  argument, that the bed is not significantly different

24  than the medicine cabinet?

25          MR. BROWN:  Correct, Your Honor.  The

1    Government raised the good faith reliance on the

2    warrant, so I'm simply responding to what I think are

3    defects in that argument.

4              THE COURT:  And it's kind of a subset

5    question here, and that is whether or not good faith

6    really applies to the entry and the observance of the

7    material in plain view if the officer was where he could

8    have been to make that observation because we're not

9    really attacking the seizure at this point.  You're

10   attacking whether or not they could have even gotten the

11   warrant based upon that information.

12             MR. BROWN:  Right.

13             THE COURT:  All right.  Thank you.  The

14   Government's response, please.

15             MR. LEEMKUIL:  Thank you, Your Honor.  The

16   Government understands that the sole issue is whether it

17   was lawful to look under the bed in this case.

18             THE COURT:  Well, yes, except that Mr. Brown

19   has raised some additional issues with regard to the

20   validity of the warrant, and what's the Government's

21   position on whether or not you have been able to

22   adequately respond to that?

23             MR. LEEMKUIL:  Well, Your Honor, those

24   arguments were not contained in the Motion to Suppress.

25             THE COURT:  They were not.

1          MR. LEEMKUIL:  So those are the first time

2     we're hearing the specific attacks on the warrant with

3     respect to the details of the employment and this red

4     pickup and things like that, so if the Court is going to

5     entertain that, we'd certainly appreciate an opportunity

6     to respond in writing.

7          With respect to looking under the bed,

8     there's no dispute there was an arrest warrant in this

9     case, and an arrest warrant and probable cause to

10    believe the Defendant is in the home authorizes a search

11    anywhere in that home where that Defendant might be

12    found.

13         The touchstone of the Fourth Amendment is

14    reasonableness, and I think facts and the law in this

15    case establish that it was reasonable for Officer

16    Minnehan to look under the bed.

17         With respect to the facts, we have body cam

18    video and photos.  Exhibit 5, Government Exhibit 5, is a

19    photograph of the space under the bed.  It shows that

20    the bed is elevated up off the floor.  There are

21    numerous items under the bed including to the right what

22    appears to be a large piece of wood.

23         The body cam video also shows the bed

24    elevated on the frame.  Officer Minnehan testified that

25    individuals that are wanted often hide from police, and

1    in his experience they often hide under beds.

2          Based on his training and experience,

3    Officer Minnehan believed at the time he was in this

4    home on July 24 that somebody could be hiding under the

5    bed.  We also think the law supports Officer Minnehan's

6    actions in looking under the bed.  We provided some

7    authority in our opposition to the motion from the

8    Eighth Circuit.

9          There's a couple cases, Parker, officers --

10   the court held officers actually lawfully looked under a

11   mattress -- not just under a bed, under a mattress --

12   while they were searching for a fugitive, and they saw

13   him at that time.

14         Ford was another case in the Eighth Circuit

15   where an officer actually moved a bed so that he could

16   look in a closet, and in moving the bed, he came upon a

17   gun.

18         There's some other case law from the Court

19   of Appeals outside of the Eighth Circuit that we

20   provided, McLevain, a search for two full-grown men, and

21   an officer looked under a bed and observed drug

22   paraphernalia in plain view.  The Court held that was

23   lawful.

24         And one case that I would like to

25   particularly draw the Court's attention to is the Flores

30

1   case that we cited from the Sixth Circuit.  There

2   officers -- the Court held officers lawfully looked

3   under a bed that was elevated just 6 inches off the

4   floor.

5           There were arguments made by the Defendant

6   similar to some that I think we've heard today, and the

7   Court held that officers that are searching for an

8   individual, quote, they need not first measure how far

9   the bed is off the floor and then determine whether a

10   person could fit under it before actually looking.

11           I think I would acknowledge, Your Honor,

12   that there may be circumstances where a bed, you know,

13   it's just inconceivable that a person is under it, you

14   know, maybe a mattress that's literally just laying on

15   the floor.

16           But here we have a bed that's on a bed frame

17   elevated off the floor, and I believe the evidence

18   establishes that at least a reasonable officer on the

19   scene searching for somebody in a home he's not been in,

20   it was reasonable in this case for Officer Minnehan to

21   look under the bed and at that time observed those

22   suspected methamphetamine.  Thank you.

23           THE COURT:  All right.  Thank you, Counsel.

24           Mr. Brown, I'll give you a rebuttal

25   opportunity, but one question that occurs to me as I'm

1  thinking about this, and that is that perhaps we come

2  right back again to the issue of whether or not the

3  officer could look under the bed because even if there

4  were problems with the warrant application in terms of

5  their accuracy, we of course can enforce the warrant if

6  there was an adequate amount of information in it that

7  was correct to support probable cause.

8          So if the officer could validly look under

9  the bed and make the plain view observation, then he

10  goes to the magistrate or the judge and says, you know,

11  "We saw the material under the bed."  Whatever the rest

12  of the warrant application might have contained, that

13  might have been enough to support it anyway.

14          So does that really just bring us back to

15  whether or not the officer could look under the bed?

16          MR. BROWN:  Well, it's a two-part question.

17  We stand on our argument that no reasonable officer

18  would have looked under the bed under these

19  circumstances.

20          If the Court found that that was true, then

21  the Court would look at the warrant and say "All right.

22  I'm going to excise the fruit of the poisonous tree

23  portion" which is that we put in the warrant that we saw

24  this under the bed already.  And then --

25          THE COURT:  Oh, I see what you're saying.

1    You're saying if I take that out, then the rest of the

2    warrant has got problems.

3            MR. BROWN:  Right, and then you have to

4    validate whether the rest of the warrant gives them

5    probable cause to get into everything that they got

6    into.

7            The how -- and the state of the record is

8    there was a pipe -- two pipes and a bong on a kitchen

9    table.  That's it.  Does that get them into the car,

10   Defendant's car?  Does it allow them to seize his cell

11   phone?  Is there probable cause to do everything that

12   they did pursuant to that warrant?

13           I submit the answer is no.  But that's the

14   two-step process.

15           THE COURT:  That helps me understand the

16   argument.  Thank you.  All right.  Let me make sure that

17   I've got these back.

18           Hannah, let me give you these.  One of them,

19   I think, is an extra copy, but okay.

20           The matter is submitted.  I think we've

21   already taken care of the issue with regard to the trial

22   date.

23           MR. BROWN:  Yes, Your Honor.

24           THE COURT:  So we'll get something out as

25   soon as we can.  Thank you.

33

1              MR. BROWN:  Thank you.

2              THE CLERK:  All rise.

3              (Hearing concluded at 11:35 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

34

1

2                    C E R T I F I C A T E

3          I, SueAnn Jones, a Certified Shorthand

4    Reporter and Notary Public in and for the State of Iowa,

5    do hereby certify that the foregoing is a true and

6    accurate computer-aided transcription of the hearing as

7    taken stenographically by and before me at the time and

8    place indicated on the title page;

9              That I am neither a relative nor employee

10   nor attorney nor counsel of any of the parties to this

11   action, and that I am not financially interested in the

12   action.

13             Dated this 7th day of November, 2018.

14

15

16                      _____

17                      SueAnn Jones, CSR, RPR

18

19

20

21

22

23

24

25

## A

able (2) 10:11 27:21
above-entitled (1) 1:13
academy (2) 6:2 18:1
accuracy (1) 31:5
accurate (1) 34:6
accurately (3) 12:22
20:15 22:15
acknowledge (1) 30:11
action (2) 34:11,12
actions (1) 29:6
active (1) 8:10
activity (1) 4:9
additional (2) 23:4
27:19
address (3) 8:5,24
24:14
adequate (1) 31:6
adequately (1) 27:22
admitted (4) 12:9 13:3
14:19 17:10
adult (3) 15:17 18:2
21:13
agency (1) 8:10
agree (1) 22:10
ahead (2) 4:23 5:2
allow (1) 32:10
Amendment (1) 28:13
AMERICA (1) 1:5
amount (1) 31:6
angle (1) 20:18
answer (1) 32:13
anyway (1) 31:13
Appeals (1) 29:19
appear (1) 18:14
appeared (1) 10:9
appears (1) 28:22
application (4) 24:2,3
31:4,12
applies (2) 24:8 27:6
apply (1) 23:23
appreciate (1) 28:5
approach (1) 9:3
approached (1) 9:6
approximately (3) 5:19
19:1 20:24
April (1) 6:10
area (1) 10:22
areas (1) 21:24
argument (6) 26:9,15
26:23 27:3 31:17
32:16
arguments (2) 27:24
30:5
arrest (5) 6:17 11:19
14:14 28:8,9
assigned (4) 5:21 6:3,8
7:19
assignment (1) 5:20

## B

Assistant (1) 2:6
associated (3) 24:16,17
24:18
attacking (2) 27:9,10
attacks (1) 28:2
attempt (2) 7:1 13:14
attended (1) 6:1
attention (1) 29:25
attorney (2) 2:12 34:10
Attorneys (1) 2:6
authority (1) 29:7
authorizes (1) 28:10
Auto (3) 24:13,16,17
Avenue (1) 2:7
average (2) 15:20,21
aware (2) 7:11 8:17
a.m (2) 1:17 33:3

bachelor's (1) 5:25
back (3) 31:2,14 32:17
baggies (4) 11:9 18:18
20:22 24:5
ball (2) 20:24 21:2
Ballard (18) 1:8 4:4 8:6
8:23 11:15,19 12:12
13:14 15:15 18:2
21:14 23:19,21 24:13
24:21 25:6,17 26:16
Ballard's (2) 8:8 13:22
bar (4) 10:22 11:17
15:23 22:3
baseball (2) 21:1,2
based (4) 4:17 13:16,20
27:11 29:2
basement (6) 10:14,18
10:21,25 12:11 16:2
basically (2) 18:21
26:22
basis (5) 24:23 25:2,10
25:14,22
bathroom (1) 26:17
bedroom (9) 10:23,24
11:3,18 12:11 15:22
16:25 21:12 22:5
beds (4) 7:6,9,12 29:1
believe (7) 13:17 18:6
22:21 23:20 25:21
28:10 30:17
believed (3) 8:5 21:12
29:3
belonging (1) 14:10
benefits (2) 24:25 25:24
big (1) 20:22
bit (2) 5:22 19:18
blue (7) 17:15 19:12,14
19:16,17,21 20:2
body (7) 7:23 12:1
20:15 22:7,10 28:17

28:23
bong (1) 32:8
bottom (9) 13:11 18:25
19:13,19,20 20:16
21:8 22:15,22
box (2) 13:7 23:21
Brian (4) 3:4 5:4,7,13
bring (1) 31:14
broader (1) 26:10
Brown (32) 2:11 4:17
8:13 12:8 13:2 14:17
14:22,23 15:2 17:8,11
17:13 20:5,7,11 21:16
23:1,6,8,10,11,14
26:12,19,25 27:12,18
30:24 31:16 32:3,23
33:1
Buena (3) 6:1 15:5
17:25
burden (2) 4:8 24:7
B&O (2) 24:13,16

## C

C (4) 2:1 4:1 34:2,2
cabinet (3) 17:17 26:17
26:24
cabinets (1) 7:6
call (2) 5:2,3
called (1) 6:6
calls (1) 6:12
cam (5) 20:15 22:7,10
28:17,23
camera (3) 7:23 12:2
22:8
car (3) 7:21 32:9,10
care (1) 32:21
Carter (1) 25:17
case (10) 4:18,25 27:17
28:9,15 29:14,18,24
30:1,20
cases (1) 29:9
cause (6) 23:20 25:20
28:9 31:7 32:5,11
cell (1) 32:10
CENTRAL (1) 1:2
certain (1) 16:11
certainly (1) 28:5
Certified (1) 34:3
certify (1) 34:5
cetera (2) 4:21,21
charges (1) 8:10
chest (1) 20:3
Circuit (4) 29:8,14,19
30:1
circumstances (2)
30:12 31:19
cited (2) 4:18 30:1
claim (9) 15:22 16:4
18:1,24 19:8 24:3,15

24:16 25:4
claimed (1) 25:16
claiming (1) 19:20
claims (5) 24:12,21
25:3,12,13
clarification (1) 5:1
Clayton (2) 4:18,25
clear (1) 11:9
Clerk (2) 2:17 33:2
clip (1) 12:1
close (1) 19:18
closet (1) 29:16
come (3) 10:19,20 31:1
commencing (1) 1:17
common (1) 7:15
compares (1) 23:17
complaints (1) 4:22
completer (1) 18:1
completion (1) 18:1
computer-aided (1)
34:6
conceal (1) 25:8
concluded (1) 33:3
conducting (3) 7:25 8:7
8:22
connected (2) 11:17,18
considerably (1) 26:10
consistent (2) 11:10
14:8
contained (1) 11:9
27:24 31:12
continue (1) 10:15
Continued (1) 11:15
contraband (1) 10:8
controlled (1) 20:22
convened (1) 4:2
copy (2) 17:11 32:19
corner (2) 10:22,23
correct (23) 13:12 15:7
15:8,10,12,14 16:3,6
16:20 17:6,7,19,23,24
18:15,16,18,19 22:5,6
22:19 26:25 31:7
counsel (2) 30:23 34:10
couple (2) 20:23 29:9
course (4) 4:8 6:15
23:12 31:5
Courthouse (1) 1:16
courtroom (2) 1:15
20:2
Court's (1) 29:25
crank (1) 18:15
created (1) 13:10
criminal (2) 4:4 5:25
cross (2) 3:3 23:1
CROSS-EXAMINA-
15:1
crystalline (1) 11:10
CSR (2) 1:25 34:16

current (1) 5:20
currently (3) 5:21
24:13,19
C&H (1) 24:17

## D

D (2) 3:1 4:1
date (1) 32:22
Dated (1) 34:13
day (2) 13:24 34:13
defects (1) 27:3
Defendant (18) 1:9
2:11 8:18 9:6,9,11,14
10:2,5,11 11:16 19:12
20:1 22:1 23:25 28:10
28:11 30:5
Defendant's (4) 4:4
16:23 22:4 32:10
degree (1) 5:25
demonstrating (1) 4:9
Department (3) 5:16,18
13:21
Department's (1) 6:4
depict (1) 12:22
Des (10) 1:16 2:9,15
5:15,18,23 6:2,3 7:25
13:21
describe (1) 10:17
details (1) 28:3
Detective (2) 25:5,11
determine (1) 30:9
diameter (1) 20:23
difference (2) 4:25 19:8
different (2) 7:5 26:23
DIRECT (2) 3:3 5:10
directly (1) 22:12
disagree (1) 18:23
discovered (1) 26:3
disk (2) 11:25 12:5
dispute (1) 28:8
distance (5) 19:5,6,22
20:13,16
distorted (1) 20:18
DISTRICT (2) 1:1,1
DIVISION (1) 1:2
doctrine (2) 23:22 24:8
doing (2) 10:7 11:5
door (2) 17:5,14
doorway (1) 22:5
draw (1) 29:25
driving (1) 7:21
drug (4) 8:12 10:10
14:7 29:21
drugs (1) 15:9
due (2) 20:18 22:22
duly (1) 5:8
duty (1) 7:17

## E

**E (9)** 1:14,21 2:1,1 3:1 4:1,1 34:2,2
**east (3)** 1:16 2:7 10:19
**Eight (1)** 19:3
**Eighth (3)** 29:8,14,19
**either (2)** 4:13 19:10
**elevated (5)** 13:8 28:20 28:24 30:3,17
**employed (3)** 5:14,17 24:13
**employee (1)** 34:9
**employment (1)** 28:3
**enforce (1)** 31:5
**enforcement (2)** 6:4,7
**enter (2)** 9:16 10:24
**entered (2)** 10:2 22:11
**entering (1)** 15:6
**entertain (1)** 28:5
**entry (3)** 4:19 23:14 27:6
**essentially (1)** 26:15
**establish (1)** 28:15
**establishes (1)** 30:18
**et (2)** 4:21,21
**eventually (1)** 10:24
**evidence (8)** 4:11,15 14:15 23:4,7 24:9 25:18 30:17
**exactly (2)** 19:25 20:19
**EXAMINATION (2)** 5:10 21:20
**examines (1)** 23:16
**exception (1)** 26:7
**excise (1)** 31:22
**excuse (1)** 16:12
**execution (1)** 6:17
**Exhibit (17)** 3:7 11:23 12:7,21 13:1 16:11,23 16:24 18:12,13 19:21 20:5,9 22:4 24:2 28:18,18
**Exhibits (2)** 14:13,18
**existed (1)** 18:24
**exists (1)** 19:8
**experience (7)** 6:16,25 7:7,14 13:16 29:1,2
**extra (1)** 32:19

**F**

**F (2)** 2:11 34:2
**fact (1)** 24:5
**facts (2)** 28:14,17
**failures (1)** 26:8
**fair (3)** 15:19 20:17 26:11
**fairly (1)** 12:22
**faith (5)** 24:8,11 26:7 27:1,5
**familiar (1)** 9:20

**far (1)** 30:8
**federal (1)** 1:15,22 24:20
**fellow (2)** 15:5 17:25
**filed (1)** 14:13
**financially (1)** 34:11
**find (5)** 11:16 15:7 22:1 23:18 26:5
**firearms (1)** 14:10
**first (4)** 5:2,21 28:1 30:8
**fishing (3)** 18:13,17,20
**fit (2)** 20:3 30:10
**Five (1)** 13:3
**floor (19)** 1:15 10:8,12 13:8,11 18:25 19:5,23 20:2,13,17 21:8 22:15 22:23 28:20 30:4,9,15 30:17
**Flores (1)** 29:25
**focus (1)** 6:13
**following (1)** 24:10
**follows (1)** 5:8
**Fong (3)** 24:12,12,21
**foot (1)** 19:17
**footage (3)** 22:8,11,14
**footstool (5)** 12:14 17:20 19:6,13,15
**Force (1)** 25:5
**Ford (2)** 25:18 29:14
**foregoing (1)** 34:5
**forward (1)** 4:6
**found (7)** 7:3,8,12 16:12,20 28:12 31:20
**foundation (1)** 8:13
**Four (1)** 12:9
**Fourth (1)** 28:13
**frame (6)** 13:5,7 21:14 25:2 28:24 30:16
**front (5)** 8:23,25 17:21 18:7 19:21
**fruit (1)** 31:22
**fugitive (1)** 29:12
**full-grown (1)** 29:20
**furnace (1)** 10:20
**further (2)** 21:16 23:1

**G**

**G (1)** 4:1
**gangs (1)** 6:13
**garage (1)** 14:7
**general (1)** 6:16
**generally (1)** 10:17
**give (3)** 17:11 30:24 32:18
**gives (1)** 32:4
**go (1)** 5:2
**goes (3)** 18:21 25:4 31:10

**going (4)** 12:20 16:22 28:4 31:22
**golf (2)** 20:24 21:2
**good (8)** 4:2 15:3,4 24:8 24:11 26:7 27:1,5
**gotten (1)** 27:10
**Government (4)** 4:8 4:10,18 5:3 12:6,21 14:13 24:7,9 27:1,16 28:18
**Government's (2)** 27:14,20
**graduate (2)** 15:6 17:25
**gray (1)** 17:17
**Griffiths (2)** 25:5,12
**Gritzner (2)** 1:14,21
**ground (1)** 19:6
**grown (1)** 15:17
**guessing (1)** 19:10
**gun (1)** 29:17
**guns (2)** 6:13 15:11

**H**

**half (1)** 5:19
**hand (1)** 18:15
**Hannah (2)** 2:17 32:18
**hear (2)** 4:14 23:9
**heard (1)** 30:6
**hearing (4)** 1:14 28:2 33:3 34:6
**height (1)** 15:20
**held (4)** 29:10,22 30:2,7
**helps (1)** 32:15
**hide (5)** 7:1,15 22:21 28:25 29:1
**hiding (8)** 7:4,8,12 9:24 13:15,18 23:21 29:4
**higher (1)** 19:22
**home (23)** 8:18 9:3,7,14 9:16,18,20,24 10:1,4 10:8,10,15,20 13:20 13:22,24 15:7 23:15 28:10,11 29:4 30:19
**homes (1)** 6:23
**Honor (23)** 4:12,16,17 12:7,25 14:13 17:8 20:7,11 21:17,19 23:1 23:5,8,11 26:5,8,12 26:25 27:15,23 30:11 32:23
**Honorable (2)** 1:14,21
**house (2)** 9:13 16:19
**human (3)** 18:2 21:13 21:13

**I**

**idea (2)** 20:4 21:10
**identification (2)** 16:23 16:24

**inches (5)** 18:24 19:2,3 20:23 30:3
**incident (1)** 12:1
**includes (1)** 22:10
**including (3)** 16:12 18:2 28:21
**inconceivable (1)** 30:13
**indicated (1)** 34:8
**indicates (1)** 16:11
**individual (1)** 30:8
**individuals (8)** 6:20,22 7:3,8,12 8:25 21:23 28:25
**informant (4)** 25:23,23 25:24,25
**information (11)** 8:15 24:14,24 25:1,6,11,15 25:17,24 27:11 31:6
**initial (4)** 4:19 23:14
**initialed (1)** 12:5
**inside (6)** 6:22 8:22 9:21,24 10:1,4
**interested (1)** 34:11
**involved (5)** 8:11,16 24:22 25:6,25
**Iowa (5)** 1:1,16 2:9,15 34:4
**issue (3)** 27:16 31:2 32:21
**issues (1)** 27:19
**Item (1)** 16:22
**items (6)** 11:11 13:20 14:4,9,15 28:21

**J**

**James (2)** 1:14,21
**Jones (3)** 1:25 34:3,16
**judge (2)** 14:23 31:10
**July (11)** 7:17,23 8:1,17 12:12,23 13:5 22:2 25:5,16 29:4
**justice (1)** 5:25

**K**

**Karaidos (2)** 24:18
**kind (4)** 12:15 17:15 18:15 27:4
**kinds (2)** 7:3 14:4
**kitchen (2)** 7:6 32:8
**know (8)** 10:1 12:3 25:10,12,13 30:12,14 31:10
**knowledge (5)** 9:23 24:23 25:14,22,22
**known (1)** 8:9
**K-a-r-a-i-d-o-s (1)** 24:19

**L**

**laid (1)** 20:1
**large (2)** 15:19 28:22
**larger (1)** 20:25
**laundry (2)** 7:5 10:21
**law (5)** 2:12,17 28:14 29:5,18
**lawful (3)** 23:15 27:17 29:23
**lawfully (3)** 23:19 29:10 30:2
**laying (1)** 30:14
**layout (2)** 9:20 10:17
**learn (1)** 8:20
**learning (1)** 4:7
**Leemkuil (18)** 2:3 4:12 4:16 5:3,11 12:6,25 14:12,20 17:9 21:19 21:21 22:24 23:4,5 27:15,23 28:1
**leg (1)** 17:20
**legitimacy (1)** 4:22
**Leon (1)** 26:7
**let's (1)** 26:15
**level (1)** 20:19
**literally (1)** 30:14
**little (2)** 5:22 19:18
**locate (2)** 10:11 13:14
**located (2)** 14:6 16:25
**log (1)** 16:19
**long (1)** 5:17
**look (16)** 4:6 11:2 12:17 13:13 20:20 22:7,17 26:17 27:17 28:16 29:16 30:21 31:3,8,15 31:21
**looked (12)** 11:7 12:11 12:23 13:4,17 15:23 22:4,11 29:10,21 30:2 31:18
**looking (13)** 15:9,11,13 15:15 17:5,14 18:12 20:19 21:24 26:16 28:7 29:6 30:10
**looks (1)** 17:15
**lower (1)** 19:22
**LSD (1)** 14:10

**M**

**machines (1)** 7:5
**magistrate (1)** 31:10
**main (2)** 10:8,12
**maintain (2)** 4:20 21:11
**male (2)** 15:17,19
**marked (4)** 7:21 9:12 11:23 12:21
**material (3)** 23:13 27:7 31:11
**materials (1)** 4:6
**matter (5)** 1:13 4:3

24:8 26:4 32:20
**mattress (5)** 13:8 23:22 29:11,11 30:14
**McLevain (1)** 29:20
**measure (2)** 19:10 30:8
**measurements (2)** 20:12 21:24
**medicine (2)** 26:17,24
**meet (1)** 15:5
**memory (1)** 19:25
**men (1)** 29:20
**methamphetamine (12)** 8:16 11:10 14:6,9,11 16:4 17:1 24:20,22 25:7,9 30:22
**MIKAELA (1)** 2:5
**Mike (1)** 24:12
**Minnehan (16)** 3:4 5:4 5:7,13 11:22 12:10,20 13:4 21:22 23:17 26:2 26:3 28:16,24 29:3 30:20
**Minnehan's (1)** 29:5
**missed (1)** 26:14
**Mitchell (2)** 1:8 4:3
**Moines (10)** 1:16 2:9,15 5:15,18,23 6:2,3 7:25 13:21
**MONTGOMERY (1)** 2:11
**month (1)** 25:4
**morning (5)** 4:2,7 15:3 15:4 26:9
**motion (5)** 4:4 23:10 26:10 27:24 29:7
**move (2)** 10:14 11:5
**moved (1)** 29:15
**moving (1)** 29:16
**Multiple (1)** 7:10

### N

**N (3)** 2:1 3:1 4:1
**name (1)** 5:12
**narcotics (3)** 6:14 8:15 25:25
**narrower (1)** 20:20
**nature (1)** 13:7
**need (1)** 30:8
**neither (1)** 34:9
**northwest (1)** 10:22
**Notary (1)** 34:4
**November (1)** 34:13
**numerous (1)** 28:21

### O

**O (1)** 4:1
**oath (1)** 5:6
**objection (7)** 4:19,20 8:13 12:8 13:2 14:17

17:9
**objective (1)** 15:6
**objects (2)** 18:12 19:9
**observance (1)** 27:6
**observation (2)** 27:8 31:9
**observations (1)** 24:10
**observe (1)** 11:7
**observed (8)** 8:23,25 10:7,9 13:20 24:5 29:21 30:21
**obtain (2)** 13:21 26:4
**obtained (3)** 16:5,8 25:23
**obviously (1)** 26:18
**occurs (1)** 30:25
**October (2)** 1:17 6:10
**offer (5)** 12:6,25 14:16 17:8 23:6
**Office (1)** 2:13
**officer (34)** 5:4,5,15,24 6:16 7:8,14 8:22 11:22 12:10,20 13:4 15:3 16:7,9 21:22 23:3,17 24:12 25:17 26:2 27:7 28:15,24 29:3,5,15,21 30:18,20 31:3,8,15,17
**officers (13)** 7:11,25 8:7,15 9:14 10:7,11 23:18 29:9,10 30:2,2 30:7
**Oftentimes (1)** 7:2
**Oh (1)** 31:25
**okay (4)** 4:23,25 26:13 32:19
**once (4)** 10:4 20:21 25:10,21
**opportunity (2)** 28:5 30:25
**opposition (1)** 29:7
**orange (1)** 31:23
**original (1)** 26:10
**ottoman (5)** 12:14,17 22:18,22,22
**outside (2)** 16:15 29:19
**Overruled (1)** 8:14

### P

**P (3)** 2:1,1 4:1
**packaging (1)** 14:8
**page (1)** 34:8
**PAGE(S) (1)** 3:7
**paid (1)** 25:2
**paraphernalia (3)** 10:10 14:8 29:22
**Park (1)** 2:13
**Parker (1)** 29:9
**part (1)** 18:13

**participate (2)** 10:5 14:2
**participated (2)** 6:17 6:19
**particularly (1)** 29:25
**parties (1)** 34:10
**parts (1)** 25:8
**party (1)** 4:13
**patrol (1)** 5:21
**people (3)** 6:14,25 14:10
**periods (1)** 6:8
**person (6)** 15:7 22:21 23:20 25:14 30:10,13
**personally (2)** 16:7,17
**phone (1)** 32:11
**photo (3)** 12:21 16:25 22:5
**photograph (3)** 18:7 19:24 28:19
**photographs (1)** 23:16
**photos (1)** 28:18
**pickup (1)** 28:4
**piece (1)** 28:22
**pipe (1)** 32:8
**pipes (1)** 32:8
**place (8)** 5:6 7:15 11:19 13:18 23:24,25,25 34:8
**places (2)** 7:3,5
**plain (4)** 23:22 27:7 29:22 31:9
**plainclothes (1)** 8:21
**Plaintiff (2)** 1:6 2:3
**plastic (1)** 11:9
**please (4)** 5:9 16:24 20:6 27:14
**pleasure (1)** 15:5
**point (3)** 9:3 10:14 27:9
**poisonous (1)** 31:22
**pole (1)** 18:13
**police (17)** 5:15,15,18 5:23 6:4,16,20 7:1,1,4 7:8,14,15,25 9:12 13:21 28:25
**portion (1)** 31:23
**position (1)** 27:21
**possession (1)** 24:19
**possible (1)** 8:12
**Possibly (2)** 21:4,6
**potential (1)** 9:23
**pound (1)** 25:7
**practice (1)** 21:23
**premarked (1)** 16:22
**premises (3)** 23:19 25:20,21
**present (3)** 2:17 4:10 8:18
**previously (2)** 12:4,5

**prior (1)** 23:13
**prison (1)** 24:20
**proactive (1)** 6:12
**probable (5)** 25:20 28:9 31:7 32:5,11
**problems (2)** 31:4 32:2
**PROCEEDINGS (1)** 1:8
**process (1)** 32:14
**property (2)** 14:5 15:13
**proved (1)** 26:3
**provide (1)** 24:14
**provided (6)** 24:25 25:5 25:14,19 29:6,20
**provides (2)** 24:23,24
**proving (1)** 24:7
**Public (1)** 34:4
**pulling (1)** 9:13
**pursuant (2)** 13:24 32:12
**pursue (1)** 9:14
**put (3)** 21:7 24:9 31:23

### Q

**quantities (1)** 25:7
**question (4)** 26:21 27:5 30:25 31:16
**questions (5)** 4:24 14:12,20 21:16 22:24
**quote (1)** 30:8

### R

**R (3)** 2:1 4:1 34:2
**radioed (1)** 8:23
**raised (2)** 27:1,19
**ran (1)** 9:13
**read (2)** 4:6 23:12
**ready (1)** 4:10
**really (3)** 27:6,9 31:14
**reasonable (5)** 23:20 28:15 30:18,20 31:17
**reasonableness (1)** 28:14
**reasons (1)** 26:5
**rebuttal (1)** 30:24
**recall (2)** 16:21 19:25
**receipt (1)** 14:15
**received (1)** 25:17
**receiving (1)** 25:24
**recognize (1)** 11:23
**recollection (1)** 16:16
**record (3)** 5:12 32:7
**red (2)** 25:18 28:3
**Redirect (2)** 21:18,20
**reel (2)** 18:17,20
**reference (1)** 24:5
**REFERRED (1)** 3:7
**reflect (2)** 20:16 22:14
**refresh (1)** 16:15

**regard (2)** 27:19 32:21
**regarding (2)** 24:9,24
**Regional (1)** 6:2
**related (1)** 4:9
**relative (1)** 34:9
**relatively (1)** 15:19
**reliability (3)** 24:24 25:12,13
**reliance (2)** 24:11 27:1
**Reported (1)** 1:25
**Reporter (1)** 34:4
**repudiate (1)** 24:11
**reputed (1)** 24:21
**reside (1)** 8:5
**residence (2)** 8:8 9:1
**respect (1)** 28:3,7,17
**respectfully (1)** 23:15
**respond (3)** 6:12 27:22 28:6
**responding (1)** 27:2
**response (1)** 27:14
**rest (3)** 31:11 32:1,4
**reviewed (1)** 12:4
**reviews (1)** 23:16
**right (28)** 4:13 15:16,17 15:20 16:18 17:2,3,15 17:21,25 18:7,12,13 18:20,22 22:18 23:2,9 26:13,19 27:12,13 28:21 30:23 31:2,21 32:3,16
**ring (1)** 19:21
**rise (1)** 33:2
**Road (1)** 2:13
**Robinson (1)** 10:9
**room (10)** 2:8 10:20,21 10:22 11:18 15:23,25 17:2 22:11,18
**Roughly (1)** 7:7
**RPR (2)** 1:25 34:16
**rungs (2)** 19:13,17
**RYAN (1)** 2:3

### S

**S (2)** 2:1 4:1
**safe (1)** 26:7
**sales (4)** 8:16 14:9 24:13,16
**saw (5)** 9:12 11:12 29:12 31:11,23
**saying (1)** 31:25 32:1
**says (1)** 31:10
**scales (1)** 14:8
**Scarlett (1)** 16:9
**scene (1)** 30:19
**search (16)** 4:9 10:5,15 13:21,22 14:2,14,16 23:19,24 24:2,3,4 26:6 28:10 29:20

**searched (2)** 6:22 13:24
**searching (8)** 4:20 6:19
   11:15 12:12 21:22
   29:12 30:7,19
**seat (1)** 5:9
**Second (1)** 1:15
**secret (2)** 21:14 23:25
**see (5)** 9:6,9 17:14 20:5
   31:25
**seen (2)** 20:8,9
**seize (3)** 11:11 16:7
   32:10
**seized (5)** 14:4,15 16:4
   16:8,17
**seizure (1)** 27:9
**separate (1)** 15:25
**Sergeant (1)** 10:9
**service (1)** 6:13
**SET (5)** 6:6,8,11,15
   7:19
**shelf (2)** 11:17 22:3
**she'll (1)** 5:6
**Shirey (1)** 2:17
**short (1)** 12:1
**shorter (1)** 19:18
**Shorthand (1)** 34:3
**SHOTWELL (1)** 2:5
**shoved (1)** 12:15
**show (5)** 11:22 12:10
   12:14,20 16:22
**shows (2)** 28:19,23
**side (2)** 10:19,21
**significantly (1)** 26:23
**similar (1)** 30:6
**simpler (1)** 26:16
**simply (2)** 25:20 27:2
**sinks (1)** 7:6
**sir (2)** 5:12 19:4
**Sixth (1)** 30:1
**six-month (1)** 6:1
**size (1)** 20:24
**slightly (1)** 20:25
**sole (1)** 27:16
**somebody (3)** 13:18
   29:4 30:19
**somewhat (2)** 19:18
   20:18
**soon (2)** 9:12 32:25
**sounds (1)** 16:18
**source (6)** 24:15,25,25
   25:1,2,11
**south (1)** 10:21
**SOUTHERN (1)** 1:1
**southwest (1)** 10:22
**space (5)** 12:22 13:10
   22:14,22 28:19
**special (1)** 6:4
**specific (2)** 24:14 28:2
**specifically (1)** 16:20

21:13 24:4
**spinning (2)** 18:17,20
**spots (1)** 9:24
**spring (2)** 13:8 23:21
**stacked (1)** 21:8
**stairs (1)** 10:19
**stand (1)** 31:17
**state (3)** 5:12 32:7 34:4
**statement (4)** 4:14
   15:20 20:17 26:11
**States (6)** 1:1,5,15,22
   2:6 4:3
**stenographically (1)**
   34:7
**step (3)** 5:5 8:24 23:2
**steps (1)** 9:1
**stolen (2)** 14:7 15:13
**stool (8)** 17:15,17,20
   19:14,16,17,21 20:2
**Street (3)** 1:16 8:4 9:4
**stuck (1)** 20:2
**subjective (1)** 26:21
**submit (2)** 23:15 32:13
**submitted (1)** 32:20
**subset (1)** 27:4
**substance (2)** 11:10
   20:22
**SueAnn (3)** 1:25 34:3
   34:16
**Suite (1)** 2:14
**Summer (1)** 6:7
**support (3)** 4:11 31:7
   31:13
**supported (1)** 4:10
**supports (1)** 29:5
**Suppress (2)** 4:5 27:24
**sure (4)** 16:10 19:24
   26:14 32:16
**surveillance (3)** 8:1,7
   8:22
**suspected (4)** 8:11 10:7
   25:18 30:22
**sworn (1)** 5:8

**T**

**T (2)** 34:2,2
**table (1)** 32:9
**tablets (1)** 14:10
**take (4)** 5:9 20:12 21:23
   32:1
**taken (3)** 22:7 32:21
   34:7
**talking (3)** 17:2 19:14
   19:16
**Tangerine (1)** 21:5
**tangerines (1)** 21:7
**Task (1)** 25:5
**team (7)** 6:4,6,7,9,11,15
   7:19

**tell (3)** 5:22 16:10,24
**terms (1)** 31:4
**testified (3)** 5:8 22:17
   28:24
**testimony (2)** 21:11
   23:17
**Thank (16)** 4:25 14:21
   14:23 17:12 21:17,19
   22:25 23:11 26:8
   27:13,15 30:22,23
   32:16,25 33:1
**theft (1)** 25:18
**things (4)** 16:11,14,17
   28:4
**think (9)** 20:1 22:17
   27:2 28:14 29:5 30:6
   30:11 32:19,20
**thinking (1)** 31:1
**thought (1)** 13:14
**thoughts (1)** 23:10
**three (1)** 5:19
**time (14)** 6:8 7:19 9:11
   10:2 11:11,20 13:16
   14:16 25:2 28:1 29:3
   29:13 30:21 34:7
**times (2)** 7:7,10
**title (1)** 34:8
**today (2)** 21:11 30:6
**top (3)** 18:21 21:8
   22:23
**touch (1)** 11:11
**touchstone (1)** 28:13
**trafficking (4)** 8:12
   24:20 25:6 26:1
**training (4)** 5:22 6:2
   13:16 29:2
**transactions (1)** 24:22
**TRANSCRIPT (1)** 1:7
**transcription (1)** 34:6
**tree (1)** 31:22
**trial (1)** 32:21
**truck (3)** 25:18,19,21
**true (2)** 31:20 34:5
**turned (1)** 9:13
**two (8)** 11:9 14:10
   18:18 19:9,13,20
   29:20 32:8
**two-part (1)** 31:16
**two-step (1)** 32:14

**U**

**ultimately (3)** 11:16
   22:1 26:4
**underneath (5)** 7:6,6
   18:10 19:12 20:3
**underside (2)** 18:21
   20:13
**understand (2)** 26:15
   32:15

**understands (1)** 27:16
**underwent (1)** 5:23
**uniform (1)** 7:21
**unit (1)** 6:12
**United (6)** 1:1,5,15,22
   2:6 4:3
**University (2)** 6:1 15:6
**unmarked (1)** 8:21
**unreasonable (2)** 24:4
   26:6
**utilized (2)** 24:3 26:3

**V**

**validate (1)** 32:4
**validity (1)** 27:20
**validly (1)** 31:8
**vehicle (5)** 8:21 9:12
   14:7 16:15 25:8
**vehicles (2)** 14:9 25:8
**video (6)** 12:3,10 20:8
   23:16 28:18,23
**view (4)** 23:22 27:7
   29:22 31:9
**Vincent (3)** 1:8 4:3 8:6
**Vista (3)** 6:1 15:5 17:25
**vs (2)** 1:7 4:3

**W**

**wall (1)** 17:18
**Walnut (1)** 1:16
**want (1)** 11:11
**wanted (8)** 6:14,20,22
   6:25 8:9 21:23 26:14
   28:25
**warrant (28)** 4:22
   13:22,25 14:14,14
   16:5,8 24:2,3,10,23
   25:19 26:4,7 27:2,11
   27:20 28:2,8,9 31:4,5
   31:12,21,23 32:2,4,12
**warrantless (1)** 23:24
**warrants (1)** 6:17
**watch (1)** 5:21
**wearing (1)** 7:23
**weight (1)** 15:20
**welcome (1)** 17:13
**went (1)** 21:12
**weren't (3)** 15:9,11,13
**West (1)** 2:15
**we'll (1)** 32:24
**we're (3)** 17:2 27:8 28:2
**we've (2)** 30:6 32:20
**wish (2)** 4:13 23:6
**withdraw (1)** 4:18
**witness (5)** 5:2,8 20:10
**WITNESSES (1)** 3:3
**wondered (1)** 4:24
**wood (1)** 28:22
**writing (1)** 28:6

**X**

**X (1)** 3:1

**Y**

**yeah (1)** 16:17
**year (3)** 6:10,10 7:17
**years (1)** 5:19

**1**

**1 (3)** 14:13,18 24:2
**10 (2)** 19:2,3
**1001 (1)** 2:13
**108 (1)** 2:14
**11 (1)** 3:8
**11:00 (1)** 1:17
**11:35 (1)** 33:3
**110 (1)** 2:7
**12 (2)** 3:8,9
**123 (1)** 1:16
**13 (1)** 3:9
**15 (1)** 3:4
**16 (1)** 3:10
**18 (1)** 3:9
**18-cr-00171-001 (1)**
   1:6
**18-171 (1)** 4:4

**2**

**20 (2)** 3:9 16:12
**2005 (2)** 8:4 9:4
**2018 (4)** 1:17 25:5,16
   34:13
**21 (1)** 3:4
**22 (1)** 3:10
**24 (9)** 7:17,23 8:1,17
   12:12,23 13:5 22:2
   29:4
**25 (3)** 1:17 16:12,12
**26 (1)** 16:12
**27 (1)** 16:13
**27th (2)** 8:4 9:4
**28 (2)** 3:9 16:13
**286 (1)** 2:8

**3**

**3 (3)** 14:13,18 16:11

**4**

**4 (3)** 3:8 11:23 12:7

**5**

**5 (10)** 3:4,9 12:21 13:1
   18:12,13 20:5,9 28:18
   28:18
**50265 (1)** 2:15
**50309 (1)** 2:9

**6**

**6 (1)** 30:3

**7**

**7th (1)** 34:13

**8**

**8 (1)** 19:1